IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SETH GOTTESMAN, individually and:
as parent and next friend of
his minor child, T.G.                :

           v.                        :   Civil Action No. DKC 25-1682

                                     :

BOARD OF EDUCATION OF MONTGOMERY
COUNTY, MARYLAND, et al.             :

### MEMORANDUM OPINION

This case is brought by Seth Gottesman, individually and as parent and next friend of his minor child, T.G., for alleged violations of his parental rights and free exercise of religion. Presently pending and ready for resolution are (1) the motion to seal Exhibit 1-13 attached to the notice of removal filed by the Board of Education of Montgomery County ("MCBE"), Montgomery County Public Schools ("MCPS"), Thomas W. Taylor, Bradley Rohner, and Yolanda Allen (collectively, "Defendants"), (ECF No. 6); (2) the motion to seal Defendant's opposition to the motion for temporary restraining order ("TRO") filed by Defendants, (ECF No. 9); (3) the motion to seal Exhibit 1 to Defendants' Local Rule 103.5.a Compliance filed by Defendants, (ECF No. 16); and (4) the motion to dismiss for failure to state a claim filed by Defendants, (ECF No. 23).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motions to seal will be granted in part

and denied in part.  The motion to dismiss will be granted in part as to the federal claims, and the remaining state administrative and constitutional claims will be remanded.

## I.    Background

### A.    Factual Background[1]

Plaintiff Seth Gottesman is a resident of Montgomery County who sent his son, T.G., to public school in the MCPS system.  (ECF No. 2 ¶ 2).  He did so because MCPS provided a "generally high level of education," was "the least expensive alternative afforded to him," and provided the "benefits of attending a diverse, community school."  (*Id.* ¶ 94).  T.G. attended Damascus High School ("DHS") starting in 2021.  (*Id.* ¶ 2).  By the end of his senior year, T.G. had completed all his academic requirements for graduation except for one: the one-credit Health requirement.  (*Id.* ¶¶ 2, 49).  Mr. Gottesman's unsuccessful efforts to exempt T.G. from the Health requirement on religious grounds are the crux of this case.

### 1.    Health Requirement and Regulations

In Maryland, public high school students must complete a one-credit Health education course, which consists of six units: (1) Mental and Emotional Health; (2) Substance Abuse Prevention; (3)

---

[1] The facts herein are either uncontroverted or set forth in the complaint and construed in the light most favorable to Plaintiff.

Family Life and Human Sexuality ("FLHS"); (4) Safety and Violence Prevention; (5) Healthy Eating; and (6) Disease Prevention and Control.   (*Id.* ¶ 16 (citing COMAR 13A.04.18.01(C))).   Maryland public schools are required to "provide an instructional program in comprehensive health education" that covers these units.  (*Id.* ¶ 63 (citing COMAR 13A.04.18.01)).  A Maryland regulation directs that "[FLHS] instruction shall represent all students regardless of ability, sexual orientation, gender identity, and gender expression."   (*Id.* ¶ 64 (quoting COMAR 13A.04.18.01(D)(2)(a))). The Maryland State Board of Education ("MSBE") has issued a Comprehensive Health Education Framework ("Health Framework"), which includes instruction in the FLHS unit on "Gender Identity and Expression" and "Sexual Orientation and Identity."   (*Id.* ¶ 65).   "[T]he Health Framework does not include similar objectives relating to . . . LGBT-SOGI[2] in any other part of the health education curriculum."  (*Id.* ¶ 67).  MCPS Health instructors teach that "non-traditional sexuality, non-traditional family units, and transgenderism are as natural and beneficial as heterosexuality,

---

[2] Plaintiff uses the acronym "LGBT-SOGI," which stands for lesbian, gay, bisexual, transgender ("LGBT"), sexual orientation and identity ("SO"), and/or gender identity or expression ("GI"). (ECF No. 2 ¶ 15).  A similar acronym, "LGBTQ+," which stands for lesbian, gay, bisexual, transgender, queer/questioning, and other sexual orientations and gender identities, is used interchangeably in this opinion.

traditional family structures, and acceptance of one's biological sex." (*Id.* ¶ 17).

In recognition of parental and religious concerns regarding FLHS content, Maryland's public school system offers parents notice of and opt-out from FLHS instruction. Specifically, all Maryland public school systems are required to "provide an opportunity for parents/guardians to view instructional materials to be used in the teaching of [FLHS] objectives," (*Id.* ¶ 64 (quoting COMAR 13A.04.18.01(D)(2)(e)(iv))), and "establish policies, guidelines and/or procedures for student opt-out regarding instruction related to [FLHS] objectives," (*Id.* (quoting COMAR 13A.04.18.01(D)(2)(e)(i))). MCPS promulgated Regulation IGP-RA, which details its Comprehensive Health Education Instructional Program. (*Id.* ¶ 68). It instructs that "FLHS materials are not to be used in any other instructional program of the school." (*Id.* ¶ 69). It further provides that "parents will be given notice of the curricular materials related to FLHS" and "[w]here FLHS is taught, students may be excused from the unit of study upon written request from their parent/guardian." (*Id.* ¶ 68).

Although the opt-out provision is not restricted to religious reasons, MCPS has provided guidance regarding religious opt-outs via its "Guidelines for Respecting Religious Diversity." That

document contains a section titled "Requests to Be Excused from Instructional Programs for Religious Reasons."  Until the 2023–24 school year, this section read as follows:

> When possible, schools should try to make reasonable and feasible adjustments to the instructional program to accommodate requests from students, or requests from parents/guardians on behalf of their students, to be excused from specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs. . . .
>
> Applying these principles, it may be feasible to accommodate objections from students or their parents/guardians to a particular reading assignment on religious grounds by providing an alternative selection that meets the same lesson objectives.  However, if such requests become too frequent or too burdensome, the school may refuse to accommodate the requests.  Schools are not required to alter fundamentally the educational program or create a separate educational program or a separate course to accommodate a student's religious practice or belief.  For example, schools are not required to excuse students from all music instruction based on a religious concern, because music is an integral part of Maryland's arts curriculum; however, schools may seek to avoid, if possible, requiring a student with a religious objection to play an instrument or sing.

(*Id.* ¶ 73).  Beginning with the 2023–24 school year, the Guidelines were changed (and shortened) to the following:

> Students may be excused from noncurricular activities, such as classroom parties or free-time events that involve materials or practices in conflict with a family's

5

> religious, and/or other, practices. However, MCPS cannot accommodate requests for exemptions from required curricular instruction or the use of curricular instructional materials based on religious, and/or other, objections.

(*Id.* ¶ 75 (emphasis omitted)).

An MCPS student may also opt not to take the school-provided Health course and instead satisfy the Health requirement through one of two alternatives: (1) an independent study designed by the student in cooperation with an MCPS staff member that covers the MCPS Health objectives, or (2) completion of the "Personal and Community Health" course at Montgomery College. (ECF No. 23-1, at 5 & n.1 (citing COMAR 13A.04.18.01(D)(2)(e); MCPS Regulation ISB-RA; ECF No. 23-4, at 2)); *id.* at 7; *see also* ECF No. 2 ¶ 42).

### 2.   Mr. Gottesman's Religious Beliefs

Mr. Gottesman holds a sincere religious belief "in the divine inspiration of the Holy Bible" and "understands his religion to impress upon him, as a father, the primary duty . . . to provide religious instruction to T.G. and to determine when to shield his child from instruction that violates his religious teachings, ethics, and principles." (ECF No. 2 ¶ 88). Discussion of sexual matters with his son is "at the[] core" of those responsibilities. (*Id.*). Mr. Gottesman believes "that same-sex actions, including same-sex marriage," and "transgender actions, including taking names and pronouns and wearing apparel inconsistent with the

6

person's biological sex, are not natural or normative, [and] that they violate the biblical and religious doctrines to which he adheres." (*Id.* ¶¶ 89-90). Per Mr. Gottesman's religious beliefs, "humans attain their fullest God-given potential by acting consistently with their biological sex." (*Id.* ¶ 91).

Accordingly, Mr. Gottesman contends that "[i]nstruction that gender transitioning is natural and appropriate" conflicts with his religious beliefs regarding the immutability of human gender and the "natural created order [of] human sexuality." (*Id.* ¶ 92 (citing *Genesis* 1:27)). Because he understands the Bible to "teach[] that cooperating with the sin of others is itself a sin, Mr. Gottesman believes he has a religious duty to stand up to evil and to reject all sinful behavior." (*Id.* ¶ 93). Without an opt-out from instruction that conflicts with his faith, Mr. Gottesman feels he would be forced to choose between free public education or sin. (*Id.*).

### 3.  Objectionable Content

Sometime "[i]n early 2022, [Mr. Gottesman] became aware of revelations of internal MCPS documents" that "were distributed in the community." (*Id.* ¶ 18). These documents included "a viewgraph used by MCPS with its teachers that indicated that MCPS was not restricting LGBT-SOGI instruction to the FLHS unit, but directing its teachers to spread those topics throughout the course,

subverting the opt-out rights of parents like [Mr. Gottesman]." (*Id.*).  In a brief that the MCBE submitted to the MSBE in March 2024, MCBE explained that a "request to confine LGBTQ+ instruction solely to the FLHS portion of the curriculum constitutes a demand for curriculum alteration, as LGBTQ+ topics are integrated throughout the entirety of the health course, not confined solely to one segment."  (*Id.* ¶ 57 (emphasis omitted) (quoting MCBE Reply Brief at 2, *T.J. & D.J. v. Montgomery Cnty. Bd. of Educ.*, MSBE Opinion No. 24-10 (2024))).  The MSBE subsequently agreed that "incorporation of LGBTQ+ resources throughout the entire health classroom fulfill[ed]" MCPS's obligations.  (*Id.* ¶ 58 (emphasis omitted) (quoting *T.J. & D.J.*, MSBE Opinion No. 24-10)).  Mr. Gottesman thus believed that "MCPS ha[d] intentionally spread LGBT-SOGI teaching *throughout* the Health course," rendering the opt-out from the FLHS unit "meaningless."  (*Id.* ¶ 59).

### 4.   Administrative Process

Concerned that FLHS instruction pervaded the DHS Health course his son would take, Mr. Gottesman "requested multiple times [beginning March 31, 2022,] to review the Health curriculum that MCPS was to teach to high school students."  (*Id.* ¶ 25).  T.G. was in ninth grade at the time.  (*Id.*).  MCPS told Mr. Gottesman to file his request under the Maryland Public Information Act ("MPIA").  (*Id.*).  Mr. Gottesman filed the MPIA request on April

11, 2022, and continued communicating with MCPS regarding review of the Health curricular materials. (*Id.* ¶ 26). MCPS replied to Mr. Gottesman's MPIA request on April 26, 2022, but did not "provide the full curriculum as requested." (*Id.* ¶ 27). Instead, MCPS informed him that his request was "too broad," the fee to fulfill the request would be between '$250 to $5,000,'" and the fee would not be waived. (*Id.*). The quoted fee was "beyond the means" of Mr. Gottesman. (*Id.*). He did not further pursue that MPIA request. (*See id.*).

On February 4, 2023, when T.G. was in tenth grade, Mr. Gottesman submitted an administrative complaint, formally titled a Complaint from the Public ("CFP"), "to DHS in which he sought a religious exemption for T.G. from the Health course requirement." (*Id.* ¶ 29). MCPS and Maryland regulations establish a review process for CFPs. (*Id.* ¶ 30).[3] First, the complainant should seek to address his concern with the school. (*Id.*). The school is

_____

[3] An older version of MCPS Regulation KLA-RA was in effect in February 2023 when Mr. Gottesman filed his CFP. *See* MCPS Regulation KLA-RA (2018), https://web.archive.org/web/20220308080008/https://ww2.montgomeryschoolsmd.org/departments/policy/pdf/klara.pdf [https://perma.cc/37EB-DSA4]. MCPS made several substantive changes to Regulation KLA-RA in October 2023 and non-substantive changes in March 2024, which are reflected in the current version. *See* MCPS Regulation KLA-RA (2024), https://ww2.montgomeryschoolsmd.org/departments/policy/pdf/klara.pdf [https://perma.cc/W9TC-LYUN]. Because the older process was in effect during the initial review, that is the process described here.

supposed to make a determination within ten workdays of receipt of the CFP. (*See id.* ¶ 31). Second, if the complainant does not hear from the school within the time required or is dissatisfied with the school's response to his concern, the complainant may request that the MCPS Chief Operating Officer ("COO") or a designee review his CFP and make a determination addressing the concerns raised in the complaint. (*Id.* ¶ 30); MCPS Regulation KLA-RA § IV.B.2 (2018), https://web.archive.org/web/20220308080008/ https://ww2.montgomeryschoolsmd.org/departments/policy/pdf/klara .pdf [https://perma.cc/37EB-DSA4]. The COO review process is supposed to take no more than twenty workdays, subject to a limited extension. *See* MCPS Regulation KLA-RA § IV.B.2.a.5, .7 (2018). Third, if the COO fails to act within sixty days, or if the complainant disagrees with the COO's decision, he may appeal to the MCBE. *Id.* § IV.B.2.a.7, .b.1; (ECF No. 2 ¶ 30). Fourth, the complainant may appeal the MCBE's decision to the MSBE. (ECF No. 2 ¶ 30); *see* COMAR 13A.01.05.02. Fifth, and finally, the Montgomery County complainant may file a petition for judicial review of the MSBE's decision in the Circuit Court for Montgomery County. (ECF No. 2 ¶ 30); *see* COMAR 13A.01.05.11(A).

Mr. Gottesman alleges that DHS failed to review his CFP and instead it was reviewed first by a COO designee. (ECF No. 2 ¶¶ 31-34). Eugenia Dawson, MCPS Director of School Support and Well-

10

Being, reached out to Mr. Gottesman regarding his CFP and met with him virtually on March 21, 2023, to discuss his opt-out request. (*Id.* ¶¶ 33-34).  After not hearing anything further regarding his CFP, (*Id.* ¶ 35), Mr. Gottesman contacted Ms. Dawson on April 10, 2023, to "communicate his interpretation and understanding that in light of MCPS' failure to decide his CFP, . . . his religious exemption had been effectively approved," (*Id.* ¶ 36).  Mr. Gottesman received no response to this communication.  (*Id.* ¶ 37). For the next seventeen months, Mr. Gottesman believed that "the religious exemption to the Health course had been conceded by MCPS."  (*Id.* ¶ 38).

On September 10, 2024, however, MCPS notified Mr. Gottesman that it had denied the religious exemption.  (*Id.* ¶ 39).  At the time, T.G. was beginning his senior year of high school.  Between September 10 and October 22, 2024, Mr. Gottesman corresponded with various MCPS and DHS officials, including the DHS Principal, Bradley Rohner, to argue that they had violated the CFP process and "could not at this late stage deny the religious exemption." (*Id.* ¶¶ 40–41).  MCPS Director of Office of School Support and Improvement Dr. Yolanda Allen (presumably Ms. Dawson's successor) responded to Mr. Gottesman on October 22, 2024, to "re-stat[e] the Health course requirement for [T.G.], suggest[] alternatives to the Health course" (namely, the independent study and Montgomery

11

College options), and "advis[e] him of his . . . right to appeal the denial of the religious exemption." (*Id.* ¶ 42; ECF No. 23-4, at 2).  Mr. Gottesman believed that the suggested alternatives were "objectionable," the Montgomery College option was "too late to implement," and his right to appeal had expired.  (ECF Nos. 2 ¶ 42; 23-4, at 2).  Indeed, Dr. Allen indicated that "[a]lthough the deadline for Semester 1 [of the Montgomery College course] ha[d] passed, this could be a viable option for Semester 2." (ECF No. 23-4, at 2).  On December 13, 2024, Mr. Gottesman appealed the decision to deny his religious exemption to the MCBE.  (ECF No. 2 ¶ 43).  He has not received any acknowledgement of or response to his appeal.  (*Id.* ¶ 44).

DHS Principal Mr. Rohner informed Mr. Gottesman on February 18, 2025, that T.G. had not earned his Health credit, which was required for graduation.  (*Id.* ¶ 45).  Mr. Gottesman responded to reiterate his belief that MCPS had violated the CFP process, inform Mr. Rohner that MCBE had not responded to his appeal, and convey his expectation that T.G. would graduate on time with his classmates.  (*Id.* ¶ 46).  Mr. Rohner replied to reaffirm that T.G. could not graduate without having earned the required Health credit.  (*Id.* ¶ 47).

On April 24, 2025, DHS denied Mr. Gottesman's request that "T.G. be allowed to participate in graduation exercises." (*Id.* ¶

12

48).  As of the time the complaint was filed, T.G.'s failure to satisfy the Health requirement and lack of a religious exemption therefrom would result in T.G.'s inability to participate in graduation exercises on May 30, 2025, and receive a high school diploma.  (*Id.* ¶ 49).

### B.  Procedural Background

Mr. Gottesman filed suit individually and on behalf of his minor son in the Circuit Court for Montgomery County, Maryland, on May 14, 2025.  (ECF No. 2, at 1).  He named as defendants the MCBE, MCPS, MCPS Superintendent Thomas W. Taylor, DHS Principal Mr. Rohner, and MCPS Director of the Office of School Support and Improvement Dr. Allen.  (*Id.*).  In his verified complaint, Mr. Gottesman asserts twelve counts.  At the core of the complaint are the five counts he brings under 42 U.S.C. § 1983.  Three of those § 1983 claims are premised on violations of the First Amendment's Free Exercise Clause for denial of the opt-out (Count VII), discrimination against religion through a system of individualized exemptions (Count IX), and official animus against religion (Count XI).  He bases another § 1983 claim on Defendants' alleged violation of his Fourteenth Amendment substantive due process right to direct the upbringing of his child (Count IV), and yet another on Defendants' alleged failure to comply with the Protection of Pupil Rights Amendment ("PPRA"), 20 U.S.C. § 1232h

13

(Count VI).   In tandem with four of the § 1983 constitutional claims, Mr. Gottesman brings analogous claims under the Maryland Declaration of Rights for violations of his religious freedom (Counts VIII, X, and XII), and parental rights (Count V).  Finally, he asserts three claims under the Maryland Administrative Procedure Act ("Maryland APA"), Md. Code Ann., State Gov't §§ 10-101 to 10-305 (West), for violations of COMAR 13A.04.18.01 and MCPS Regulation IGP-RA (Count I), MCPS Guidelines for Respecting Religious Diversity (Count II), and MCPS Regulation KLA-RA (Count III).

On May 23, 2025, just one week before his son's high school graduation, Mr. Gottesman filed a motion for a TRO requesting that his son be permitted to participate in DHS graduation exercises, graduate without penalty, and receive his diploma.  (ECF No. 1-13).  He attached twenty-two exhibits to the TRO motion.

Defendants removed the case to this court on May 27 on the basis of federal question jurisdiction over the § 1983 claims and supplemental jurisdiction over the state claims.  (ECF No. 1).[4] Defendants filed a response in opposition to the TRO motion under seal on May 28, (ECF No. 8), along with an accompanying motion to

---

[4] Defendants' Notice of Removal incorrectly cites to 28 U.S.C. § 1441(c) as the source of this jurisdiction.  (ECF No. 1 ¶ 5). That error is not fatal in this instance.  *See Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 778-79 (8th Cir. 2009).

14

seal, (ECF No. 9).  Additionally, Defendants filed motions to seal the exhibit attached to their notice of removal containing the TRO motion and its attached exhibits, (ECF No. 6), as well as the exhibit attached to their Local Rule 103.5.a Compliance filing that contains the record of the state proceedings, (ECF No. 16). Mr. Gottesman did not oppose any of the motions to seal.

The court held a hearing on the TRO motion on May 29.  (ECF No. 11).  At the hearing, counsel for Mr. Gottesman narrowed the scope of relief sought to only the request that Mr. Gottesman's son be allowed to participate in DHS graduation exercises the following day.  (ECF No. 20, at 10).  Because Mr. Gottesman was requesting a mandatory rather than prohibitory injunction, the court noted that he must show a particularly high likelihood of success on the merits.  (*Id.* at 91).  On the record at the time, Mr. Gottesman had failed to satisfy that burden on any of the twelve counts.  (*Id.* at 92–95).  Accordingly, the court denied the TRO motion.  (ECF No. 12).

Given the denial of Mr. Gottesman's requests for temporary injunctive relief, the remaining requests for relief in the complaint are: (1) permanent injunctive relief to allow T.G. to graduate and receive his high school diploma; (2) a series of declarations related to the Health requirement, advance notice of

15

Health curricular materials, and the opt-out system; (3) damages; and (4) attorney's fees and costs.  (ECF No. 2, at 48-50).

Defendants filed their motion to dismiss Mr. Gottesman's complaint for failure to state a claim on June 6.  (ECF No. 23). They filed a supplement on July 15 to discuss the intervening decision of the Supreme Court of the United States in *Mahmoud v. Taylor*, 606 U.S. 522 (2025), another case arising out of Montgomery County that involved opt-outs regarding instructional materials containing LGBTQ+ content offensive to parents' sincerely held religious beliefs.  (ECF No. 26).  After several extensions, Mr. Gottesman responded to both the motion to dismiss and supplement on August 25.  (ECF No. 31).  Defendants replied on September 15. (ECF No. 32).

## II.  Motions to Seal

When considering motions to seal, courts in this circuit must balance the individual's privacy interest with the "qualified right of access to judicial documents and records filed in civil and criminal proceedings" of the press and the general public. *Doe v. Pub. Citizen*, 749 F.3d 246, 265 (4th Cir. 2014); *see also Rock v. McHugh*, 819 F.Supp.2d 456, 475 (D.Md. 2011) (noting that certain sensitive personal information may be sealed).  As the *Public Citizen* court explained:

> When presented with a motion to seal, the law
> in this Circuit requires a judicial officer to

16

> comply with the following procedural requirements: (1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; (2) consider less drastic alternatives to closure; and (3) if it determines that full access is not necessary, it must state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives.

*Id.* at 272 (citing *In re Knight Publ'g Co.*, 743 F.2d 231, 234–35 (4th Cir. 1984)). Likewise, Local Rule 105.11 requires the party seeking sealing to provide "(a) proposed reasons supported by specific factual representations to justify the sealing and (2) an explanation why alternatives to sealing would not provide sufficient protection."

Defendants have filed three motions to seal. Two of the motions seek to seal Plaintiff's TRO motion and its exhibits, which were attached to Defendants' notice of removal at ECF No. 1-13 and filed in compliance with Local Rule 103.5.a at ECF No. 18. (ECF Nos. 6, 16). Specifically, Defendants note that Exhibits 6, 9, 11, 12, 13, 15, 16, 17, 18, and 19 to the TRO motion "possess confidential personally identifying information" ("PII") of Plaintiff's minor son. (ECF Nos. 6 ¶¶ 2, 3; 16 ¶¶ 2, 3). The other motion seeks to seal Defendants' response in opposition at ECF No. 8 to Plaintiff's TRO motion, including the exhibits attached to the opposition, because it "cites to the confidential information and documents contained in . . . Plaintiff's exhibits,"

and "their own exhibits . . . contain personally identifying and confidential information."  (ECF No. 9 ¶ 5).  Plaintiff did not oppose any of the motions.

The less drastic alternative of redaction is appropriate with respect to all three motions.  On the one hand, there is no prevailing public interest in accessing the PII of a minor.  *Heward v. Bd. of Educ.*, No. 23-cv-195-ELH, 2023 WL 6067072, at *3 (D.Md. Sep. 15, 2023) ("[C]ourts have found a compelling government interest in sealing personal information, especially when relating to minors." (collecting cases)); Fed.R.Civ.P. 5.2(a)(3) ("[I]n an electronic or paper filing with the court that contains . . . the name of an individual known to be a minor, . . . a party or nonparty making the filing may include only the minor's initials[.]").  On the other hand, Defendants themselves note in the three motions that "Plaintiff filed these documents with redactions" in state court, (ECF Nos. 6 ¶ 2; 9 ¶ 2; 16 ¶ 2), and they offer no reason why redaction is insufficient to protect the PII at issue.  Rather than seal the documents filed at ECF Nos. 1-13 and 18, the court will direct Defendants to file redacted versions of those documents that protect the PII of Plaintiff's son.  As for Defendants' opposition brief, it embeds several of the same exhibits containing PII from Plaintiff's TRO motion and thus should be redacted to protect that information, rather than sealed.  Finally, Defendants

18

attach eight exhibits to their opposition, but only Exhibits C, E, G, and H appear to contain PII.  (ECF Nos. 8-5; 8-7; 8-9; 8-10).  Those exhibits should be redacted in the same fashion as the previous documents discussed, and the other exhibits should be neither sealed nor redacted.

## III. Motion to Dismiss

Defendants' motion to dismiss all twelve counts of Plaintiff's complaint is largely meritorious.  Plaintiff's five federal claims are deficient both factually and legally.  Without those federal claims, the court will decline to exercise supplemental jurisdiction over Plaintiff's seven state claims.  The novel and complex issues of state law implicated in those state law claims further counsel against the exercise of supplemental jurisdiction.  Therefore, Plaintiff's federal claims will be dismissed and his state claims will be remanded to state court.

### A.    Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  The court "must accept the complaint's factual allegations as true and construe the facts in the light most favorable to the plaintiff."  *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 469 (4th Cir. 2025) (citing *Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024)).  A

19

plaintiff's complaint must only satisfy the standard of Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed.R.Civ.P. 8(a)(2)). A Rule 8(a)(2) "showing" requires "stat[ing] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays v. Sprinkle*, 992 F.3d 295, 299–300 (4th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).

### B.   Threshold Matters

### 1.   Exhibits

The court must determine which extrinsic documents may be considered on a motion to dismiss. "As a general rule, the court does not consider extrinsic evidence at the motion to dismiss stage[.]" *Faulkenberry v. U.S. Dep't of Def.*, 670 F.Supp.3d 234, 249 (D.Md. 2023) (quoting *Reamer v. State Auto. Mut. Ins. Co.*, 556 F.Supp.3d 544, 549 (D.Md. 2021), *aff'd*, No. 21-2432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022)). "However, 'the court may

20

consider, without converting the motion to dismiss into one for summary judgment, documents attached to the complaint as exhibits, and documents attached to a motion to dismiss if the document is integral to the complaint and there is no dispute about the document's authenticity.'" *Id.* (quoting *Reamer*, 556 F.Supp.3d at 549). "[F]or an extrinsic document to be integral to a complaint the document must either give rise to a claim or be the basis of an element of a claim." *Defs. of Wildlife v. Boyles*, 608 F.Supp.3d 336, 345 (D.S.C. 2022); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

Defendants attach four exhibits to their motion to dismiss. Exhibits 2-4 are copies of opinions by the MSBE and Circuit Court for Montgomery County, (ECF Nos. 23-5; 23-6; 23-7), so they are public records of which the court may take judicial notice. *See Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009) ("[A] federal court may consider matters of public record such as documents from prior state court proceedings in conjunction with a Rule 12(b)(6) motion." (citing *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994))). Exhibit 1 is the October 22, 2024, email from Dr. Allen to Plaintiff explaining that T.G. had not completed his Health requirement and suggesting the independent study and Montgomery College alternatives. (ECF No. 23-4). Defendants argue that the email is authentic, integral to and relied on in the

21

complaint, and a public record.[5]  (ECF No. 23-1, at 10).  In his opposition, Plaintiff does not challenge the authenticity of the email or otherwise argue against the court's consideration of it. (*See generally* ECF No. 31).  The court will consider the email to be authentic.  Moreover, the email is relied on in the complaint, (ECF No. 2 ¶ 42), and integral to the complaint because it forms part of the asserted burden on Plaintiff's free exercise of religion.  Therefore, the court will consider the email in Exhibit 1 without converting Defendants' motion into one for summary judgment.

### 2.   MCPS Is Not a Suable Entity

Defendants first seek to dismiss MCPS as a defendant because it "is not a distinct legal entity empowered to sue or be sued." (ECF No. 23-1, at 10 (citing *Miller v. Montgomery Cnty. Pub. Schs.*, No. 19-cv-3067-TJS, 2020 WL 2097686, at *1 (D.Md. May 1, 2020))). Instead, MCPS "is simply the operational name for the school system administered by the . . . MCBE."  (ECF No. 32, at 12).  Defendants contend that Maryland law authorizes only the county school *board*, MCBE, rather than the county school system, to be sued.  (*Id.* (citing Md. Code Ann., Educ. § 3-104(b) (West))).   Plaintiff

---

[5] Defendants do not explain how the email constitutes a public record.  Because the email is appropriate to consider on separate grounds, it is unnecessary to decide whether the email is a public record.

argues, however, that the then-Maryland Court of Appeals recently decided a case in which the named defendant was MCPS and the court "consistently referred to it as such." (ECF No. 31, at 7-8 (citing *Donlon v. Montgomery Cnty. Pub. Schs.*, 460 Md. 62 (2018))).

Defendants are correct that MCPS cannot be sued. As this court recently explained, it is well established that "MCPS is not a distinct legal entity empowered to sue or be sued. Under Maryland law, the board of education for each county school system . . . is the entity which is empowered to sue and be sued." *Jones-McDaniel v. Bd. of Educ.*, No. 24-cv-3075-DKC, 2025 WL 2494345, at *4 (D.Md. Aug. 29, 2025) (quoting *Miller*, 2020 WL 2097686, at *1). The question of whether MCPS could be sued was not before the Maryland Court of Appeals in *Donlon*, which instead consistently referred to MCPS as the "county school board" and the "county board of education." *See, e.g.*, *Donlon*, 460 Md. at 75 ("The questions for which we granted Donlon's petition focus on whether *county boards of education* are units of the State Executive branch." (emphasis added)). The intermediate appellate court below had simply clarified that "[t]he legal name for [MCPS] is 'the Board of Education of Montgomery County.'" *Montgomery Cnty. Pub. Schs. V. Donlon*, 233 Md.App. 646, 650 n.3 (2017) (quoting Md. Code Ann., Educ. § 3-104 (West)). In other words, at no point did any court in the *Donlon* litigation conceive of the MCPS and MCBE as two

distinct entities capable of being sued separately.  MCPS will be dismissed as a defendant.

### 3.   Defendants' Group-Pleading Argument Fails

Defendants request dismissal of all claims with prejudice for lack of fair notice because Plaintiff "repeatedly groups [them] together and often collectively refers to them as the 'defendants' without attributing any particular act to a specific defendant that would support a cause of action."  (ECF No. 23-1, at 12 (collecting citations)).  It is true that "[a] plaintiff does not satisfy [Fed.R.Civ.P.] 8 when the complaint 'lump[s] all the defendants together and fail[s] to distinguish their conduct because such allegations fail to give adequate notice to the defendants as to what they did wrong.'"  *Classen Immunotherapies, Inc. v. Biogen IDEC*, 381 F.Supp.2d 452, 455 (D.Md. 2005) (third and fourth alterations in original) (quoting *Appalachian Enters., Inc. v. ePayment Sols. Ltd.*, No. 01-cv-11502, 2004 WL 2813121, at *7 (S.D.N.Y. Dec. 8, 2004)).  But that is not what Plaintiff does here.  Instead, Plaintiff specifically notes in his statement of the facts that Mr. Rohner denied his opt-out request, (ECF No. 2 ¶¶ 41, 45, 47–48), Dr. Allen denied his opt-out request, (*Id.* ¶ 42), Mr. Taylor was "responsible for implementing and enforcing policies, rules, and regulations adopted by MCBE," (*Id.* ¶ 7), and all three were acting on behalf of the MCBE, (*Id.* ¶¶ 7–9).

24

Plaintiff incorporates these allegations into each count.  (*Id.* ¶¶ 112, 116, 120, 124, 133, 145, 150, 156, 163, 168, 172, 176).  He sufficiently distinguishes the conduct of each defendant to provide fair notice under Rule 8.  Whether his allegations against each defendant are sufficient to state a claim under Rule 8 is, of course, a separate question.

### C.    Federal Claims

### 1.    Section 1983 "Persons" and Immunity

Plaintiff brings five counts under 42 U.S.C. § 1983.  He asserts each count against the MCBE, along with Mr. Taylor, Dr. Allen, and Mr. Rohner (collectively, "Individual Defendants") in their individual and official capacities.  In each count, he seeks damages and prospective injunctive relief.  Due to the intricacies of § 1983 law, only some of these claims for relief survive.

To begin, a "person" is the only proper defendant to a § 1983 claim.  The Supreme Court has long held that a state entity is not a "person" for the purposes of § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 242 (4th Cir. 2020).  It is likewise well established that the MCBE is a state entity.  *McNulty v. Bd. of Educ.*, No. 03-cv-2520-DKC, 2004 WL 1554401, at *4 ("This court has made clear, consistently and repeatedly, that the county boards of education of Maryland are state agencies[.]" (collecting cases)).

25

So, as Defendants point out, the MCBE is not a "person" and thus not subject to suit in law or equity under § 1983. (ECF No. 23-1, at 13-14).

Plaintiff's counterargument is unavailing. He notes that Maryland has waived the sovereign immunity of county boards of education on any claim for damages of $400,000 or less in Md. Code Ann., Cts. & Jud. Proc. § 5-518(c) (West). (ECF No. 31, at 5). The then-Maryland Court of Appeals held that this waiver applies to Eleventh Amendment immunity in federal court, too. *Bd. of Educ. v. Zimmer-Rubert*, 409 Md. 200, 216 (2009). And as the United States Court of Appeals for the Fourth Circuit has instructed, a federal court must defer to a state high court's decision regarding whether a particular state law waives Eleventh Amendment immunity. *Lee-Thomas v. Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 251 (4th Cir. 2012). But the scope of § 1983 and that of Eleventh Amendment immunity are "separate issues." *Will*, 491 U.S. at 66. Although the Supreme Court in *Will* looked to the Eleventh Amendment as context for the meaning of "person" that Congress intended in § 1983, it did not inextricably link the two such that a state entity could waive itself into the statute. *Id.* at 66-67. The statutory term simply excludes state entities and does not create liability for them. This conclusion may "make[] little sense" to Plaintiff, (ECF No. 31, at 6), but it is the conclusion that

26

binding precedent commands.[6]    Accordingly, the § 1983 claims against the MCBE will be dismissed with prejudice.

Dismissing the § 1983 claims against the MCBE leaves those asserted against Individual Defendants in their individual and official capacities.   As employees of the MCBE, Individual Defendants are state officials.  Under § 1983, a plaintiff may sue a state official for damages in his individual capacity but not his official capacity.   *Hafer v. Melo*, 502 U.S. 21, 27 (1991) ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them.   By contrast, officers sued in their personal capacity come to court as individuals." (citing *Will*, 491 U.S. at 71)).   Moreover, a plaintiff may sue a state official for prospective injunctive

---

[6] Plaintiff makes various other arguments that do not change this conclusion.  He represents that the Fourth Circuit in *Lee-Thomas* "treated the Board as a proper defendant under § 1983 up to the [statutory damages] cap."  (ECF No. 31, at 6).  *Lee-Thomas*, however, involved an Americans with Disabilities Act claim to which § 1983 personhood was entirely irrelevant.  *See* 666 F.3d at 247. He also presents a policy argument for accountability, (ECF No. 31, at 6), but such an argument cannot override a binding decision of statutory interpretation.  Finally, he contends that Maryland cannot escape its waiver via removal to federal court.  (*Id*.). That is true.  *Biggs*, 953 F.3d at 241 ("In this circuit, a state's removal of a suit to federal court waives sovereign immunity only if the state has consented to suit in its own courts." (citing *Stewart v. North Carolina*, 393 F.3d 484, 490 (4th Cir. 2005))). The  waiver,  however,  remains  irrelevant  to  the  statutory definition of "person" in § 1983.

relief in his official capacity but generally not his individual capacity. *Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" (citation modified)); *Cmty. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd.*, 150 F.App'x 389, 401 (6th Cir. 2005) ("[A] plaintiff should not be able to sue a defendant in his individual capacity for an injunction in situations in which the injunction relates only to the official's job, *i.e.*, his official capacity."). Putting those pieces together, Plaintiff may sue Individual Defendants in their individual capacity for damages and their official capacity for prospective injunctive relief.

The individual capacity claims are properly asserted against Dr. Allen and Mr. Rohner, but not Mr. Taylor. In a § 1983 suit against a defendant in his individual capacity, "vicarious liability is inapplicable" and the "plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution" or federal law. *Iqbal*, 556 U.S. at 676 (emphasis added). A plaintiff can plead supervisory liability only if he pleads that (1) the supervisor knew his subordinate's conduct "posed 'a pervasive and

28

unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) the supervisor's response "was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and (3) the supervisor's inaction caused the particular constitutional injury. *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). Defendants do not challenge Plaintiff's allegations of personal involvement as to Dr. Allen and Mr. Rohner, but they do contend that Plaintiff "fails to identify any personal involvement by Taylor in the purportedly unlawful actions which took place against him." (ECF No. 23-1, at 11). Plaintiff responds that Mr. "Taylor's involvement [was] in adopting the positions of the prior MCPS Superintendent, which Plaintiff's Complaint alleges gave rise to his claims for relief and damages." (ECF No. 31, at 7). Defendants are correct. Plaintiff alleges no particular action that Mr. Taylor took in violation of his federal rights and only generally avers that Mr. Taylor "was responsible for implementing and enforcing policies, rules, and regulations adopted by MCBE." (ECF No. 2 ¶ 7). All his allegations pertain to actions taken by state officials below Mr. Taylor; they do not demonstrate Mr. Taylor's personal involvement, nor can they satisfy the stringent requirements of supervisory liability. Accordingly, Plaintiff's individual-

29

capacity claims against Mr. Taylor constitute an impermissible end-run around § 1983's bar on vicarious liability and must be dismissed.

The official-capacity claims are proper against all three individual defendants even without Mr. Taylor's personal involvement.  For an official-capacity suit under § 1983 to be proper, there must be "'a special relation between the officer being sued and the challenged' government action."  *King v. Youngkin*, 122 F.4th 539, 548 (4th Cir. 2024) (quoting *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010)).  "A 'special relation' requires both '*proximity to* and *responsibility for* the challenged state action.'"  *Id.* (quoting *McBurney*, 616 F.3d at 399).  At no point do Defendants contend that any one of them is not responsible for enforcing state and county education requirements and regulations.  Regulation KLA-RA explicitly provides each of the individual defendants with decision-making authority over complaints regarding the application of laws, MCBE policies, and MCPS regulations and rules, including those regarding opt-outs.  MCPS Regulation KLA-RA §§ I, IV.B (Principal), IV.C (OCOS or designee), IV.D (Superintendent).  Accordingly, all three individual defendants are properly sued in their official capacity for prospective injunctive relief.

Defendants argue, however, that such official-capacity claims against Mr. Taylor must be dismissed because they are "essentially[] an action against the municipal government," (ECF No. 23-1, at 11–12 (quoting *Felder v. Leggett*, No. 16-cv-3469-ELH, 2017 WL 1491463, at *5 (D.Md. Apr. 26, 2017))), and thus when the municipality is also a defendant on identical claims, "the claims against the municipal official are redundant," (*Id.* at 12 (quoting *Corral v. Montgomery County*, 4 F.Supp.3d 739, 748 (D.Md. 2014))). Plaintiff does not respond to this contention. Defendants' argument rests on a mistaken premise.  For purposes of § 1983 claims, Mr. Taylor is a *state* official, not a municipal official. *McNulty*, 2004 WL 1554401, at *4.  While it is true that an official-capacity claim against a municipal official is essentially one against the municipality and thus redundant if an identical claim is asserted against the municipality, that statement cannot be true if the defendant is a state official.  That is so because states, unlike municipalities, are not "persons" under § 1983. *See Will*, 491 U.S. at 70; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Official-capacity "suits [for prospective injunctive relief] against state officials who violate federal law are *not* suits against the state." *Biggs*, 953 F.3d at 242 (emphasis added) (citing *Bland v. Roberts*, 730 F.3d 368, 390 (4th Cir. 2013)). Therefore, such suits are not essentially against the state and

31

cannot be redundant of a claim against the state.  Mr. Taylor is subject to suit in his official capacity.

The final § 1983 issue to discuss is the defense of qualified immunity that Individual Defendants raise.[7]  (ECF No. 23-1, at 31– 35).  Qualified immunity to suit under § 1983 exists to "protect[] government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The "driving force" behind the creation of this doctrine "was a desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'"  *Id.* at 231–32 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)).  It entails a two-step inquiry, to be performed in either order: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct."  *Id.* at 232, 236 (quoting and citing *Saucier v. Katz*,

---

[7] Defendants clarify in their reply that they do not also assert failure to exhaust state administrative remedies as a defense to the § 1983 counts.  (ECF No. 32, at 9).  In any event, the Supreme Court has directly foreclosed such a defense.  *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982) ("[E]xhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983.").

533 U.S. 194, 201 (2001)); *see also Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024).   Importantly, however, the qualified immunity "defense is not available[] . . . [in] § 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages."   *Id.* at 242 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).   Qualified immunity likewise does not apply to claims for declaratory relief. *Lefemine v. Wideman*, 672 F.3d 292, 303 (4th Cir. 2012) (citation modified), *rev'd on other grounds*, 568 U.S. 1 (2012).   Because Plaintiff seeks injunctive and declaratory relief on each of his five § 1983 counts, in addition to damages, the utility of the qualified immunity inquiry is significantly diminished.   Moreover, the failure of Plaintiff's § 1983 claims as pleaded obviates the need for a qualified immunity defense.

To recap, Plaintiff properly asserts the five § 1983 counts against Dr. Allen and Mr. Rohner in their individual capacity for damages, and against all three individual defendants in their official capacity for declaratory and prospective injunctive relief.

### 2.   Free Exercise of Religion

At the core of Plaintiff's Complaint are his three Free Exercise claims.   In essence, they represent three distinct reasons why Plaintiff believes strict scrutiny should apply, a standard he

contends is not and cannot be met.  In Count VII, he argues that the denial of notice of LGBTQ+ materials and opt-out from the Health course requirement created a substantial burden on his right to direct the religious upbringing of his child.[8]  (ECF No. 2 ¶¶ 152-53).  He now contends that the burden is the same as that at issue in *Mahmoud* and thus is subject to strict scrutiny rather than the standard rational basis review.  (ECF No. 31, at 3, 12, 14).  In Count IX, assuming his religious exercise is burdened, Plaintiff alleges that Defendants' opt-out policy is not generally applicable because it admits of exceptions, (ECF No. 2 ¶ 165); making the same assumption in Count XI, Plaintiff alleges that Defendants' opt-out policy is not neutral because it is motivated by animus toward his religious beliefs, (*Id.* ¶ 174).

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.  This prohibition has been incorporated against the states via the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  Ordinarily, "the government is generally free to place incidental burdens on religious exercise so long as it does so

---

[8] It is important to clarify what Plaintiff requested.  He did not simply request an opt-out from the FLHS unit, as MCPS regulations permit, or an opt-out from any specific class in which LGBTQ+ materials would be used.  Instead, he sought an opt-out from the state law Health course graduation requirement.

pursuant to a neutral policy that is generally applicable." *Mahmoud*, 606 U.S. at 564 (citing *Emp. Div. v. Smith*, 494 U.S. 872, 878-79 (1990)). If the court finds such a burden, it must then "ask if the burdensome policy is neutral and generally applicable." *Id.* If it is, rational basis review applies. *Jesus Christ Is the Answer Ministries, Inc. v. Balt. County*, 915 F.3d 256, 265 (4th Cir. 2019) (citing *Smith*, 494 U.S. at 879). If it is not, the policy triggers strict scrutiny. *Mahmoud*, 606 U.S. at 564.

Last year in *Mahmoud*, however, the Supreme Court clarified that courts must proceed directly to strict scrutiny if they find a burden of a particular character on the "right[] of parents to direct the religious upbringing of their children." *Mahmoud*, 606 U.S. at 547, 564 (quoting *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020)). Because "many parents 'have no choice but to send their children to public school[,]' . . . the right of parents 'to direct the religious upbringing of their' children . . . follow[s] those children into the public school classroom." *Id.* at 547 (quoting *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring)). This right is "violated by government policies that 'substantially interfer[e] with the religious development' of children." *Id.* (alteration in original) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). Beyond direct compulsion of children "to depart from the religious practices of

35

their parents," violations can also include "more subtle forms of interference" that pose "the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent."  *Id.* at 548-49 (quoting *Yoder*, 406 U.S. at 218).   In other words, the inquiry focuses on whether the policy carries "'a very real threat of undermining' the religious beliefs that the parents wish to instill in their children."  *Id.* at 553 (quoting *Yoder*, 406 U.S. at 218).  The Court explicitly used as a benchmark its decision in *Wisconsin v. Yoder*, in which the Court mandated an exemption for Amish parents from a state law requiring children's attendance at school until the age of sixteen.  *Id.* at 564 (holding that strict scrutiny is triggered "[w]hen the burden imposed is of the same character as that imposed in *Yoder*").

Whether a government policy constitutes a "very real threat" is a "fact-intensive"[9] question dependent on "the specific religious beliefs and practices asserted" and "the specific nature of the educational requirement or curricular feature."  *Id.* at 550.  Relevant to the latter factor are the age of the targeted

---

[9] Plaintiff argues that because the Court labeled the inquiry "fact-intensive," it cannot be resolved on a motion to dismiss. (ECF No. 31, at 13).  "Fact-intensive" simply means that context matters.  Plaintiffs still must carry their burden to "plead[] factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays*, 992 F.3d at 299–300 (quoting *Iqbal*, 556 U.S. at 678). Plaintiff has not carried that threshold burden here.

children and whether the instruction or materials are presented in a "neutral" or "hostile" manner. *Id.* If the court finds that a "very real threat" exists, such a burden triggers strict scrutiny.

Plaintiff's complaint undoubtedly implicates the right to direct the religious upbringing of one's child. But saying that right is burdened does not make it so. Plaintiff fails to allege a burden akin to the one present in *Yoder* and *Mahmoud*, much less any cognizable burden on his religious exercise. Therefore, all three of his free exercise claims fail.

To begin, Plaintiff's complaint is factually insufficient. Despite the complaint's considerable length, Plaintiff's factual allegations regarding the use of LGBTQ+ instructional materials appear in only a few paragraphs. He explains that he "became aware of training materials for MCPS teachers of the Health Course for the 2022-23 school year by obtaining a few pages from a non-official source." (ECF No. 2 ¶ 97). One page stated that among the training day's objectives was the following: "Review LGBTQ+ resources to incorporate more inclusive language in the Health Education classroom throughout the ENTIRE course." (*Id.*). He further provides a quotation that allegedly appears in a legal brief submitted by Defendants in a separate, administrative proceeding, which says that it is "consistent with MCPS's local policy and educational objectives" that "LGBTQ+ topics are

37

integrated throughout the entirety of the health course." (*Id.* ¶ 57 (emphasis omitted)).  Finally, he points to the MSBE's opinion in that same case, in which the MSBE "agree[d] with the local board [MCBE/MCPS] that incorporation of LGBTQ+ resources throughout the entire health classroom" fulfills Defendants' state law responsibilities.  (*Id.* ¶ 58 (alteration in original) (emphasis omitted) (quoting *T.J. & D.J.*, Opinion No. 24-10)).  Despite learning in 2022 of Defendants' alleged plan to incorporate more inclusive language throughout the entire Health course, which was then in place for several years before Plaintiff filed suit, Plaintiff offers only a few vague quotations from the MCBE and MSBE that inclusion of LGBTQ+ materials throughout the Health course is permissible.  None of these factual allegations, if they can all be called such, refers to specific materials used in the Health classroom in MCPS, much less at DHS.  In *Mahmoud*, by contrast, the plaintiffs identified at least seven books that would be read to their children and the guidance to teachers about how to discuss the LGBTQ+ themes involved.  *Mahmoud*, 606 U.S. at 533 n.6; *see also* Amended Complaint ¶¶ 113-44, *Mahmoud v. McKnight*, 688 F.Supp.3d 265 (2023), ECF No. 36 (discussing in detail the objectionable contents of those seven books).  The absence of any such detail in Plaintiff's complaint means he has not alleged "enough to raise a right to relief above the speculative level."

38

*Twombly*, 550 U.S. at 555 (citing 5 Wright & Miller's Federal Practice & Procedure § 1216 (3ᵈ ed. 2004)).

Plaintiff's dearth of factual allegations renders it impossible to assess "the specific nature of the educational requirement or curricular feature" in question as the Court instructed in *Mahmoud*. The way the material is presented and the age of the students targeted are the paramount factors to consider. Plaintiff obviously assumes that any LGBTQ+ materials used outside the FLHS unit in the Health course are presented in a hostile manner so as to impose on his son a "pressure to conform." *Mahmoud*, 606 U.S. at 550 (quoting *Yoder*, 406 U.S. at 211). The *Mahmoud* Court described such hostile presentation as involving "unmistakably normative" messages that contravene parents' religious beliefs. *Id.* Without any particular materials to consider in Plaintiff's case, he is unable to allege that Defendants are pushing any normative message related to LGBTQ+ issues outside the FLHS unit. Even assuming LGBTQ+ materials are presented in other Health units, Defendants appropriately highlight a key conceptual distinction. (ECF No. 23-1, at 17). As a Maryland circuit court recently held in a nearly identical case, the incorporation of "more inclusive language, including reference to the diverse LGBTQ+ community, into instructional materials (consistent with the educational equity requirement for

39

each local school board to use materials that are inclusive) is not the same as the LGBTQ+ related direct teaching and instruction that occurs in the FLHS unit of the class." (*Id.* (quoting ECF No. 23-7, at 7)).

And even if the court stacks the assumption that some of the materials conveyed a normative message on top of the assumption that any such materials were presented at all, high school students are far less prone to uncritical acceptance of such messages. The *Mahmoud* Court repeatedly emphasized the importance of age in assessing the nature of the challenged instruction. It explained that "the age of the children involved is highly relevant in any assessment of the likely effect of instruction on the subjects in question." *Mahmoud*, 606 U.S. at 555 n.8; *see also id.* at 550 ("Educational requirements targeted toward very young children[] . . . may be analyzed differently from educational requirements for high school students."). Accordingly, "[h]igh school students may understand that widespread approval of a practice does not necessarily mean that everyone should accept it, but very young children are most unlikely to appreciate that fine point." *Id.* at 551. Here, unlike *Mahmoud*, high school students are the relevant population. They are not as "impressionable" as their elementary school counterparts, and in Health class they are considerably less "likely to accept without question any moral messages conveyed

40

by their teachers' instruction." *Id.* at 551.  At the very least, Plaintiff has not alleged any facts to counteract this commonsense intuition.  Accordingly, to the extent the Health course presents LGBTQ+ materials outside the FLHS unit, the age of the students significantly diminishes the risk that the school will pressure a student to conform to beliefs contrary to those of their parents.[10]

Finally, and most importantly, Defendants have provided adequate alternatives to Plaintiff that were still available despite the purportedly late notice that his opt-out request had been denied.  These alternatives included an independent study and a course at Montgomery College.  As the email sent to Plaintiff explains, at any time, he and his son could have proposed an independent study that accomplishes the Health course objectives,

---

[10] Plaintiff argues that "[c]ourts cannot assume high-school students are immune from burdens on conscience," and that the FLHS opt-out exists "because lawmakers recognized those burdens remain significant."  (ECF No. 31, at 13-14).  Of course, high school students are not immune from such burdens; the students in *Yoder* were of high-school age, after all.  But Plaintiff's argument about the opt-out rationale cuts against him.  MCPS regulations permitted an opt-out from the FLHS unit of study, MCPS Regulation IGP-RA § III.e.4.c (2020), and prohibited the use of FLHS materials "in any other *instructional program* of the school," *id.* § III.e.2 (emphasis added).   The instructional program is "Comprehensive Health Education," not the FLHS unit.  *Id.* § I.  So, the regulation bars the use of FLHS materials in other instructional programs outside the Health course, but not in other units within the Health course. It follows that lawmakers provided the opt-out from FLHS instruction but *not* the general use of FLHS materials.  Thus, lawmakers acknowledged that the burden of the use of FLHS materials was meaningfully different from, and lesser than, that of FLHS instruction.

which his son could have completed under faculty supervision. (ECF No. 23-4, at 2; *see also* ECF No. 2 ¶ 42). Plaintiff himself acknowledges that Maryland's "Health Framework does not include objectives relating to non-traditional, alternative family structures and LGBT-SOGI in any other part of the health education curriculum" besides the FLHS unit. (ECF No. 2 ¶ 67). Given the available opt out from the FLHS unit, Plaintiff's son could have completed an independent study avoiding LGBTQ+ materials and objectives entirely, earned his Health credit, and graduated. Alternatively, Plaintiff's son could have attended the course "Personal and Community Health" at Montgomery College. (ECF No. 23-4, at 2). True, that may have only been an option for the Spring Semester because the Fall Semester deadline had passed when Plaintiff learned of it. (*Id.*). But Plaintiff's son still could have completed an independent study in the Fall Semester and had the option of completing either an independent study or the Montgomery College course in the Spring Semester. As Defendants point out, Plaintiff's complaint "contains no factual allegations that either alternative included constitutionally objectionable content, violated his religious beliefs, or was prohibitively expensive." (ECF No. 32, at 4). All Plaintiff musters, without any support, is that the alternatives were "objectionable." (ECF No. 2 ¶ 42). That is not enough.

42

Nor does Plaintiff's single counterargument hold purchase. He contends that he was put to the impermissible choice "either [to] risk [his] child's exposure to burdensome instruction, or pay substantial sums for alternative educational services." *Mahmoud*, 606 U.S. at 569; (ECF No. 31, at 12).[11]  That impermissible choice arises, however, when the alternatives are private school or homeschooling. *Mahmoud*, 606 U.S. at 560-62.  Here, the public school is offering to supervise an independent study or permit Plaintiff's son to attend a pre-approved course at a local community college.  In either event, Plaintiff by no means would be giving up his son's public education or required to pay costs akin to those associated with private school tuition or homeschooling.  Instead, the choice is between various public avenues of completing the Health requirement.

Finally, because Plaintiff has failed to allege a cognizable burden on his free exercise rights, his claims that Defendants'

---

[11] Plaintiff gestures at an additional argument: "Even when one option was free, the Court recognized the stigma, disruption, and coercion that accompany forcing families into alternative channels."  (ECF No. 31, at 12-13).  He does not specify where in *Mahmoud* he derives the rule that even the provision of a free alternative is coercive.  To be sure, the Court dismissed the "free" alternative that parents could simply instruct their children differently outside of school, *Mahmoud*, 606 U.S. at 562-63, but such an alternative is different in kind because it supplements, rather than replaces, the burdensome instruction. The alternatives here *replace* the allegedly burdensome instruction.

43

policy is neither generally applicable (Count IX) nor neutral (Count XI) necessarily fail. *Mahmoud v. McKnight*, 688 F.Supp.3d 265, 302 n.14 (2023) ("Because the plaintiffs have not shown that the no-opt-out policy likely will burden their religious exercise, the Court need not address whether the policy is neutral and generally applicable[.]"), *aff'd*, 102 F.4th 191 (2024), *rev'd in part sub nom.*, *Mahmoud v. Taylor*, 606 U.S. 522 (2025).[12]

For the reasons above, Plaintiff has failed to allege a violation of his First Amendment right to direct the religious upbringing of his son. His three First Amendment claims will be dismissed.

### 3.   Parental Rights

Plaintiff's failure to state a claim under the First Amendment likewise dooms his parental-rights substantive due process claim under the Fourteenth Amendment.

---

[12] The Supreme Court in *Mahmoud* considered only the following question: "Do public schools burden parents' religious exercise when they compel elementary school children to participate in instruction on gender and sexuality against their parents' religious convictions and without notice or opportunity to opt out?" Petition for Writ of Certiorari at i, *Mahmoud*, 606 U.S. 522 (No. 24-297), 2024 WL 4227215, at *i; *Mahmoud v. Taylor*, 145 S.Ct. 1123, 1123 (2025) (mem.) (granting writ of certiorari on question presented). It did not address any other issues decided in the district court and Fourth Circuit. Therefore, the portions of the district court's and Fourth Circuit's opinions dealing with issues other than the religious burden question are unaffected by the Supreme Court decision. *See Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019).

In Count IV, Plaintiff alleges that parents have a fundamental right "to direct the care, custody, education, and control of their minor children" under the Fourteenth Amendment.  (ECF No. 2 ¶ 127). He contends that this fundamental right includes "the right of parents to counsel their children on important decisions related to their health and safety, to determine what is in the best interests of their minor children, to determine when their minor children should be counseled on matters related to sexual identity and family life, and to determine whether their children should attend public school."  (*Id.*).  Because "[m]atters regarding homosexuality and transgenderism relate directly to the minor child's sexual identity and are at the core of family life," Plaintiff posits, they also touch the "core" of parents' fundamental rights.  (*Id.* ¶ 128).  Defendants allegedly infringed on such rights by denying advance notice of Health instructional materials and Plaintiff's request to opt his minor son out of the Health course, in which LGBTQ+ instruction was allegedly spread throughout, rather than confined to, the FLHS unit.  (*Id.* ¶¶ 129– 30; ECF No. 31, at 4).  Accordingly, Plaintiff contends that strict scrutiny applies and that Defendants cannot satisfy it.  (ECF No. 2 ¶¶ 131–32).  Defendants move to dismiss this count on the ground that only rational basis review applies, which they satisfy, because parents' "asserted due process right to direct their

45

children's upbringing by opting out of a public-school curriculum that conflicts with their religious views is not a fundamental right." (ECF No. 23-1, at 20 (quoting *Mahmoud*, 688 F.Supp.3d at 306) (citing *Mahmoud v. McKnight*, 102 F.4th 191, 217 (2024), *rev'd in part sub nom.*, *Mahmoud v. Taylor*, 606 U.S. 522 (2025))).

Defendants' denial of the opt-out is subject to only rational basis review. Judge Boardman explained the contours of the substantive due process inquiry:

> Under substantive due process jurisprudence, "courts examine whether government intrusions into citizens' liberties are justified by adequate state interests." *Herndon by Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174, 177 (4th Cir. 1996). "A substantive due process challenge is considered under rational-basis review unless some fundamental right is implicated." *Doe v. Settle*, 24 F.4th 932, 953 (4th Cir. 2022) (citing *Herndon*, 89 F.3d at 177). Fundamental rights are those "which are, objectively, deeply rooted in this Nation's history and tradition." *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21[] (1997)). "Critical to the 'fundamental interest' inquiry is the requirement that it be conducted on the basis of a 'careful description of the asserted fundamental liberty interest.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 720[]). In defining the asserted liberty interest, courts must avoid "overgeneralization in the historical inquiry." *Id.* at 747 (citing *Glucksberg*, 521 U.S. at 722-23[]).

*Mahmoud*, 688 F.Supp.3d at 302. In other words, Plaintiff must carefully define each parental right and identify a substantial

historical pedigree for each such right.  A right does not become fundamental by a plaintiff's *ipse dixit*.  Given the strictures of the fundamental right inquiry, "most due process challenges to public school policies are subject only to rational basis review." *Mahmoud*, 102 F.4th at 217 (citing *Herndon*, 89 F.3d at 177–79). Here, the parental rights Plaintiff asserts are fundamental all implicate, in the context of this case, "parental control over a child's public education."  *Mahmoud*, 688 F.Supp.3d at 303.  But "the parental right to direct a child's education is not fundamental unless it includes a religious element."  *Id.* at 304; *Herndon*, 89 F.3d at 179 ("[T]he Supreme Court has stated consistently that parents have a liberty interest, protected by the Fourteenth Amendment, in directing their children's schooling. Except when the parents' interest includes a religious element, however, the Court has declared [that] . . . rational basis scrutiny [applies].").  Plaintiff makes no express mention in Count IV of his right to control his child's *religious* education.  To the extent his claim is purely secular, then, rational basis review applies.

To the extent Plaintiff's parental-rights claim *does* contain a religious element, which it certainly appears to despite his failure to say so explicitly in Count IV, it is still subject to only rational basis review.  The Fourth Circuit in *Mahmoud*

47

described such a claim as a "hybrid-rights" claim, meaning a single claim that rests on the violation of multiple constitutional rights.  102 F.4th at 217.  Here, as in *Mahmoud*, Plaintiff's "due process claim involving parents' rights related to the education of their children is 'coupled with' a religious-exercise claim." *Id.* (citing *Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 243–47 (3ᵈ Cir. 2008)).  The hybrid-rights theory suggests that heightened scrutiny is triggered when constitutional rights are so coupled in a single claim, *id.*, and finds its origins in the Supreme Court's opinion in *Employment Division v. Smith*, 494 U.S. 872 (1990).  The *Smith* Court suggested that "hybrid" cases would trigger heightened scrutiny, and cited *Yoder* as an example, but declined to apply that theory to the case because the plaintiffs had not presented such a theory.  494 U.S. at 881–82.  Within the Fourth Circuit, "the validity of the hybrid-rights approach remains an open question."  *Mahmoud*, 102 F.4th at 217.  And the Supreme Court has declined to provide any guidance on it.  *Mahmoud*, 606 U.S. at 565 n.14 (describing the *Smith* Court's hybrid-rights characterization of *Yoder* as "speculat[ion]" and concluding that the Court "need not consider whether the case before [it] qualifies as such a 'hybrid rights' case").  In any event, a hybrid-rights claim does not warrant strict scrutiny if the assertion of one of the two alleged constitutional violations is deficient.  *See Mahmoud*, 102

48

F.4th at 217 ("Regardless of the underlying merits of a hybrid-rights due process claim, it could only be the basis for a preliminary injunction if the Parents' free exercise claims were *also* likely to succeed on the merits." (citation omitted)); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1237 (9th Cir. 2020) ("[A]lleging multiple failing constitutional claims that do not have a likelihood of success on the merits cannot be enough to invoke a hybrid rights exceptions and require strict scrutiny." (citation omitted)). Because Plaintiff does not state a plausible claim for relief on his free exercise claims, his hybrid-rights due process claim is not subject to strict scrutiny, but rather to rational basis review.

Plaintiff points to the Supreme Court's *Mahmoud* decision for the proposition that "when a district denies notice and opt-outs as to contested content, courts do not dispose of parental claims on the pleadings." (ECF No. 31, at 4). The Supreme Court's opinion reflects no such proposition. *Mahmoud* was a case decided on the preliminary injunction record, not the pleadings, and more importantly, it did not address the parental-rights substantive due process claims. *Mahmoud*, 606 U.S. at 545–46 (noting the preliminary injunction posture); *id.* at 626 (Sotomayor, J., dissenting) ("[T]he Court's analysis makes no mention of substantive due process rights or the Fourteenth Amendment Due

Process Clause."). Nothing in the Court's *Mahmoud* opinion bars disposing of Plaintiff's parental-rights claim at the motion-to-dismiss stage.

Thus, any version of Plaintiff's parental-rights claim is subject to rational basis review. The challenged government action easily passes muster. Rational basis review "requires only that the [challenged state action] be shown to bear some rational relationship to legitimate state purposes." *Herndon*, 89 F.3d at 177 (alteration in original) (quoting *S.A. Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40 (1973)). "Under this deferential standard, the plaintiff bears the burden 'to negate every conceivable basis which might support' the legislation." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). "To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies[.]" *Id.* (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)). Plaintiff challenges three state actions: (1) refusal to provide advance notice of the Health instructional materials; (2) spreading LGBTQ+ instructional materials throughout the Health course rather than just the FLHS unit; and (3) refusal to allow opt-outs from the Health credit requirement. At no point does Plaintiff argue that

50

any of the challenged state actions fails rational basis review. Therefore, he cannot overcome the presumption of rationality, and his claim fails.

Moreover, each challenged state action had a rational basis. Defendants did offer to provide advance notice of the materials but for a fee due to the extensive nature of Plaintiff's request. (ECF No. 2 ¶ 27). Defendants' response to Plaintiff's request bears a rational relationship to the legitimate state interest of mitigating administrative and fiscal burdens. *Armour v. City of Indianapolis*, 566 U.S. 673, 686 (2012) (holding that it is rational for the government to seek to avoid an administrative burden). As for the spreading of LGBTQ+ instructional materials throughout the Health course, Plaintiff has provided no factual support for the contention that LGBTQ+ instruction is occurring in any portion of the Health course outside the FLHS unit. At most, the court can infer that resources in other units refer to LGBTQ+ individuals or subject matter. The court agrees with Defendants that including such LGBTQ+ resources throughout the Health course is rationally related to the MCBE's legitimate interest in promoting "social integration and cultural inclusiveness of transgender and gender nonconforming students[,] . . . providing a safe and supportive learning environment for its students, protecting LGBTQ students' health and safety, and complying with anti-discrimination laws."

51

(ECF No. 23-1, at 20 (quoting *Mahmoud*, 688 F.Supp.3d at 306)). Finally, the Maryland government undoubtedly has a significant interest in fostering a health-conscious population through mandatory Health education that opt-outs from the entire course would frustrate. *See Tri-Cnty. Paving, Inc. v. Ashe County*, 281 F.3d 430, 441 (4th Cir. 2002) (noting that "protecting the health or welfare of county residents" is a legitimate interest).

Because Plaintiff's parental-rights claim cannot withstand rational basis review, it will be dismissed.

### 4. PPRA

Finally, Plaintiff alleges that Defendants violated his right under the PPRA and the United States Constitution to review the Health instructional materials at no fee when they "refus[ed] his reasonable requests to do so" and "condition[ed] such access on exorbitant and unreasonable fees." (ECF No. 2 ¶¶ 146, 147, 149).

Plaintiff's PPRA claim is premised on the following provision within the statute:

> [A] local educational agency that receives funds under any applicable program shall develop and adopt policies, in consultation with parents, regarding the following:
>
> . . .
>
> (C)
>
>> (i) The right of a parent of a student to inspect, upon the request of the parent, any instructional material used as part

52

of the educational curriculum for the student; and

(ii) any applicable procedures for granting a request by a parent for reasonable access to instructional material within a reasonable period of time after the request is received.

20 U.S.C. § 1232h(c)(1)(C); (ECF No. 2 ¶ 147).   A Maryland regulation provides that "[t]he local school system shall provide an opportunity for parents/guardians to view instructional materials to be used in the teaching of [FLHS] objectives."  COMAR 13A.04.18.01(D)(2)(e)(iv).      Montgomery    County    regulations implement this state directive:

Each school will hold an informational meeting to provide an opportunity for parents/guardians to discuss the FLHS unit of study with teachers and review instructional materials.  For parents/guardians unable to attend the informational meeting, the school shall make available special opportunities for parents/guardians to view all instructional materials to be used in the unit of study before the materials are used in the classroom.

MCPS Regulation IGP-RA § III.E.4.b (2020).  The mechanism the MCBE evidently chose to field parental requests to review instructional materials was the MPIA.  (ECF No. 2 ¶ 25).  Plaintiff filed his request to review the Health instructional materials under the MPIA.  (*Id.* ¶ 26).  The MCBE responded to the MPIA request but "claim[ed] that the request was too broad, and that fulfillment of his request would require estimated fees to be incurred between

53

'$250 to $5,000,' and that such means would not be waived." (*Id.* ¶ 27). Plaintiff apparently did not pursue any further action on his MPIA request and now alleges that the MCBE's response violated his rights under the PPRA.

Defendants move to dismiss Plaintiff's PPRA claim because it does not create enforceable rights via a § 1983 action. (ECF No. 23-1, at 21–22). Plaintiff acknowledges in response that "[s]ome courts agree" with Defendants or treat the PPRA as enforceable via § 1983 "only when federal funds and surveys are involved." (ECF No. 31, at 8 (citation omitted)). He offers that his "claims do not rise or fall with [the] PPRA" and that the court "may treat [the] PPRA allegations as contextual and reserve decision on any stand-alone PPRA count." (*Id.*).

Although the issue is somewhat closer than either party recognizes, the court ultimately agrees with Defendants that the relevant provision of the PPRA is not the sort of provision Congress intended to be enforceable via a § 1983 claim. Numerous courts have been presented with the question of whether a provision of the PPRA is enforceable under § 1983, but none appear to have engaged in a fulsome analysis of the provision in question, 20 U.S.C. § 1232h(c)(1)(C). *See Herbert v. Reinstein*, 976 F.Supp. 331, 340 (E.D.Pa. 1997) (holding that § 1232h(b) was not enforceable by plaintiffs under § 1983 because plaintiffs were not

54

intended beneficiaries of survey provision); *Altman v. Bedford Cent. Sch. Dist.*, 45 F.Supp.2d 368, 391 (S.D.N.Y. 1999) (same), *aff'd in part, vacated in part, rev'd in part on other grounds*, 245 F.3d 49 (2ᵈ Cir. 2001); *C.N. v. Ridgewood Bd. of Educ.*, 146 F.Supp.2d 528, 535-37 (D.N.J. 2001) (concluding that even if § 1232h(b) were enforceable under § 1983, plaintiff's claim would fail), *aff'd*, 430 F.3d 159 (3ᵈ Cir. 2005); *Ashby v. Isle of Wight Cnty. Sch. Bd.*, 354 F.Supp.2d 616, 623 n.9 (E.D.Va. 2004) (holding that § 1232h(b) does not create a private right of action and declining to reach whether it would be enforceable under § 1983); *Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 22-cv-337, 2023 WL 5018511, at *21-22 (S.D.Ohio Aug. 7, 2023) (assuming without deciding that § 1232h(b) is enforceable under § 1983); *Myers v. Beaverton Sch. Dist. 48J*, No. 25-cv-677, 2025 WL 2019336, at *5 (D.Or. July 18, 2025) (finding it unlikely that § 1232h(b) is enforceable under § 1983).

As a baseline, the Supreme Court has recognized that for Spending Clause legislation like the PPRA, "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)).  In the "atypical

55

case," however, Spending Clause legislation *can* generate enforceable rights under § 1983. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023). The Court set out the governing test in *Gonzaga University v. Doe* and recently restated it: The statutory provision must "'unambiguously confe[r]' individual rights" on "'a class of beneficiaries' to which the plaintiff belongs," thereby "making those rights 'presumptively enforceable' under § 1983." *Id.* (alteration in original) (quoting *Gonzaga*, 536 U.S. at 283–84). Courts "employ traditional tools of statutory construction" to make this assessment. *Id.* In *Talevski*, the Court provided further guidance on this front:

> We have held that the *Gonzaga* test is satisfied where the provision in question is "phrased in terms of the persons benefited" and contains "rights-creating," individual-centric language with an "unmistakable focus on the benefited class." [*Gonzaga*, 536 U.S.] at 284, 287[] (emphasis deleted). Conversely, we have rejected § 1983 enforceability where the statutory provision "contain[ed] no rights-creating language"; had "an aggregate, not individual, focus"; and "serve[d] primarily to direct the [Federal Government's] distribution of public funds." *Id.*[] at 290[].

*Id.* at 183–84.

The statutory provisions at issue in *Gonzaga* and *Talevski* shed light on what is needed to find an unambiguously conferred right. In *Gonzaga*, the Court considered a provision of the Family

56

Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g, which other courts have referred to as the PPRA's "sister statute," *Doe No. 1*, 2023 WL 5018511, at *21.  That provision provided that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents to any individual, agency, or organization."  20 U.S.C. § 1232g(b)(1).  Because the provision is "two steps removed from the interests of individual students and parents," "speak[s] only in terms of institutional policy and practice, not individual instances of disclosure," and "expressly authorize[s] the Secretary of Education" to enforce the statute through a "centralized review" process, the Court held that the statute did not unambiguously confer an enforceable right.  *Gonzaga*, 536 U.S. at 287-90.  The *Talevski* Court, on the other hand, concluded that two provisions of the Federal Nursing Home Reform Act ("FNHRA") are enforceable under § 1983.  Both provisions are found in 42 U.S.C. § 1396r(c), titled "Requirements Relating to Residents' Rights," which "is indicative of an individual 'rights-creating' focus."  *Talevski*, 599 U.S. at 184 (quoting *Gonzaga*, 536 U.S. at 284).  One provision required nursing homes to "protect and promote . . . *[t]he right* to be free from . . . any physical or chemical

57

restraints imposed for purposes of discipline or convenience and not required to treat *the resident's* medical symptoms." *Id.* (quoting 42 U.S.C. § 1396r(c)(1)(A)(ii)).  The other instructed nursing homes that they "'must not transfer or discharge [a] *resident*' unless certain preconditions are met." *Id.* at 185 (alteration in original) (quoting and citing 42 U.S.C. § 1396r(c)(2)(A)-(B)).  Although these two provisions specify who "must respect and honor these statutory rights[,] . . . that is not a material diversion from the necessary focus on the nursing-home residents." *Id.*

Here, the particular PPRA provision shares similarities with the provisions in both *Talevski* and *Gonzaga*.  Like the "Requirements Related to Residents' Rights" title in *Talevski*, the fact that the statute here is titled "Protection of Pupil Rights" "is indicative of an individual 'rights-creating' focus." *Talevski*, 599 U.S. at 184 (quoting *Gonzaga*, 536 U.S. at 284).  That being said, the Family Educational *Rights* and Privacy Act considered in *Gonzaga* also explicitly mentions rights, so this fact is not dispositive.  Like the chemical-restraint provision in *Talevski* and unlike the FERPA provision in *Gonzaga*, § 1232h(c)(1)(C) explicitly mentions "*[t]he right* of a parent of a student to inspect[] . . . any instructional material."  The statute later refers to this as one of "the rights *established*

under this section."  20 U.S.C. § 1232h(f) (emphasis added).  But § 1232h(c)(1) merely requires school districts to "develop and adopt policies[] . . . regarding" that right.  It thus operates at the policy level like the FERPA provision in *Gonzaga*, not at the individual level like the FNHRA provisions in *Talevski*.  Accordingly, it is less clear than in *Talevski* that the provision's articulation of those responsible for protecting the right "is not a material diversion from the necessary focus" on the parents.  With that lack of clarity in mind, it is important to note that *Talevski* is the *only* Supreme Court case permitting enforcement of a Spending Clause statutory right via § 1983 of which the Court continues to approve.  *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 377 (2025) (noting that of the three Supreme Court cases holding that Spending Clause statutory rights are enforceable via § 1983, *Talevski* is the only one the Court has not repudiated).  Given the great caution that implies, and the requirement that the conferral of the right be *unambiguous*, § 1232h(c)(1)(C) does not meet the high bar of § 1983 enforceability.

Even assuming that § 1232h(c)(1)(C) does unambiguously confer a parental right to review instructional materials, the statute still would not be enforceable via § 1983.  When "a statutory provision unambiguously secures rights, a defendant 'may defeat t[he] presumption by demonstrating that Congress did not intend'

59

that § 1983 be available to enforce those rights." *Talevski*, 599

U.S. at 186 (alteration in original) (quoting *City of Ranchos Palos*

*Verdes v. Abrams*, 544 U.S. 113, 120 (2005)).  To do so, a defendant

may show that Congress created a "comprehensive enforcement scheme

that is *incompatible* with individual enforcement under § 1983."

*Id.* (emphasis added) (quoting *Ranchos Palos Verdes*, 544 U.S. at

120).[13]  Such incompatibility may exist when Congress provides "a

private judicial right of action" or a "private federal

administrative remedy."  *Id.* at 190; *see also id.* at 195 (Barrett,

J., concurring) (explaining that "contextual clues" of

incompatibility include enforcement provisions authorizing

government officials to sue, administrative remedies, and a

centralized review mechanism).  Here, the PPRA directs the

Secretary of Education to "take such action as the Secretary

---

[13] Defendants focus on whether the PPRA provision in question confers rights and thus do not make a specific incompatibility argument.  (*See* ECF Nos. 23-1, at 21–22; 32, at 8).  They do note the Secretary's role, however, in policing compliance with the statute.  (ECF No. 23-1, at 21–22).  The exact nature of the defendant's burden, including whether it can be adjudicated on a motion to dismiss, is unclear.  But various courts have held the burden to be discharged at this early stage, *see, e.g.*, *Trepanier v. Ryan*, No. 00-cv-2393, 2004 WL 1102417, at *3 (N.D.Ill. May 17, 2004), and the court sees little reason why discovery or further development of the litigation is needed to flesh out remedial incompatibility, a question of statutory interpretation. Therefore, even if § 1232h(c)(1)(C) unambiguously conferred a parental right, the court would hold that Defendants have discharged their burden by pointing to the Secretary's role in the statute, which is incompatible with § 1983 enforcement.

determines appropriate to enforce this section," including "action to terminate assistance."  20 U.S.C. § 1232h(e).  Crucially, it further instructs the Secretary to "establish or designate an office and review board within the Department of Education to investigate, process, review, and *adjudicate* violations of the rights established under this section."  *Id.* § 1232h(f) (emphasis added).  In other words, the statute provides a private federal administrative remedy via a centralized review mechanism for statutory violations, implicitly precluding enforcement via § 1983.

Finally, even considering the PPRA claim on its merits, Plaintiff at no point explains why the right of a parent to inspect instructional material categorically bars charging a fee for such inspection.  His categorical no-fee rule would lead to the absurd result that any parent could impose crippling administrative burdens on a school or school district at no cost.  *See Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2018) ("[Courts] are to avoid 'interpretations of a statute which would produce absurd results . . . if alternative interpretations consistent with the legislative purpose are available." (citation omitted)). The PPRA is silent on fees, most likely because it directs local education agencies to "develop and adopt policies" regarding the inspection right and "procedures for granting a request by a parent

61

for *reasonable* access to instructional material within a *reasonable* amount of time." 20 U.S.C. § 1232h(c)(1)(C)(ii) (emphasis added). In doing so, Congress likely left the issue of fees to the discretion of local education agencies, bounded by reasonableness.[14] Accordingly, unreasonable fees might give rise to a statutory violation, but a plaintiff would need to allege why the fee charged was unreasonably disproportionate to the request. Here, the MCBE informed Plaintiff that his request was "too broad" and would require a fee of "$250–$5,000." (ECF No. 2 ¶ 27). Plaintiff contends that this fee was "unreasonable" but fails to explain why it was disproportionate to his request for all the instructional materials used in the Health course. (*See id.*). That failure is fatal to any PPRA claim he might have.

Plaintiff also grounds this right to review in the U.S. Constitution, but the Constitution provides no better hook for his claim. He ties the right to review to the parental right "to determine whether their minor child should attend public school." (ECF No. 2 ¶ 146). If he means to assert the right to review as a substantive due process right, he makes no effort to demonstrate its historical pedigree. *Glucksberg*, 521 U.S. at 720–21. If he

---

[14] When Congress wants to establish when fees can and cannot be charged for document requests from government agencies, it knows how to do so. *See* 5 U.S.C. § 552(a)(4)(A) (Freedom of Information Act fee provisions); *id.* § 552a(f)(5) (Privacy Act fee provision).

means to assert it as a procedural due process right, he has failed to allege adequately any liberty interest of which he was deprived. Moreover, he has failed to allege that the existing state remedies for any deprivation were inadequate. *Zinermon v. Burch*, 494 U.S. 113, 126 (1990) ("The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process."). The MPIA under which Plaintiff sought review of the instructional materials provided a pathway to have an ombudsman review the denial of his request and fee waiver, Md. Code Ann., Gen. Provisions § 4-1B-04 (West), and then appeal the ombudsman's determination to the Public Information Act Compliance Board, *id.* § 4-1A-05. Plaintiff did not pursue these avenues of review.

**D.   Leave to Amend**

Plaintiff asks for leave to amend if the court "identifies any curable pleading deficiency (e.g., substitution of the Board for 'MCPS,' additional detail as to a defendant, or refinement of a statutory count)." (ECF No. 31, at 15). The defects in the complaint are far more fundamental. Leave to amend is denied.

**E.   State Claims**

Once this court has federal question jurisdiction over one or more claims in any action, it also has, pursuant to 28 U.S.C. § 1367(a), supplemental jurisdiction "over all other claims that are

63

so related to claims in the action . . . that they form part of the same case or controversy."  A court may, however, decline to exercise supplemental jurisdiction if "the claim raises a novel or complex issue of State law," or "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C § 1367(c)(1), (3); *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 31–32 (2025).  Both of those grounds apply here.

First, the court has dismissed all federal claims as discussed above.  At this early stage of the litigation, remand of claims arising under state law is the normal course.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").  "With all [the] federal questions gone, there may be the authority to keep [this case] in federal court under 28 U.S.C. §§ 1367(a) and 1441(c) (2000), but there is no good reason to do so."  *Waybright v. Frederick County,* 528 F.3d 199, 209 (4th Cir. 2008).  The court declines to exercise supplemental jurisdiction over the seven state claims in the complaint.

Second, the issues presented by the state administrative and constitutional claims raise some novel and some complex issues of state law best left to state courts to resolve.  An issue of state

law is novel if it is a matter of first impression for the state courts or is currently pending before a state appellate court. *Winingear v. City of Norfolk*, No. 12-cv-560, 2013 WL 5672668, at *4 n.6 (E.D.Va. Oct. 16, 2023) (citing *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 731 F.Supp.2d 849, 850 (E.D.Wis. 2010); *Erdman v. Nationwide Ins. Co.*, 621 F.Supp.2d 230, 238 (M.D.Pa. 2007, *aff'd*, 582 F.3d 500 (3d Cir. 2009)); *see also Green v. Zendrian*, 916 F.Supp. 493, 496 (D.Md. 1996) (holding that the issue was novel and/or complex because it was a "serious issue of first impression"). There is little guidance on the complexity inquiry, other than that the issue must be "intricate," and perhaps "important." *See Arrington v. City of Raleigh*, 369 F.App'x 420, 423 n.2 (4th Cir. 2010).

The state administrative claims in Counts I-III raise novel and complex issues of state law. Principal among these issues is that of exhaustion of state administrative remedies, given the apparent procedural mishaps that occurred. The court is unaware of any Maryland cases interpreting the MCPS procedural regulation at issue. Therefore, Plaintiff's compliance or lack thereof with the administrative process raises novel issues. *See Omnis Health Life, LLC v. Optum, Inc.*, No. 24-cv-3642-ELH, 2025 WL 2659881, at *4 (D.Md. Sep. 17, 2025) (holding particular administrative exhaustion issue is novel and/or complex issue of Maryland law).

65

Other novel and complex issues include the applicability of the Maryland APA or Maryland's *Accardi* doctrine.[15] *See* Md. Code Ann., State Gov't § 10-202(b) (West) (agencies covered by the Maryland APA); *id.* § 10-222 (Maryland APA judicial review provision); *Pollock v. Patuxent Inst. Bd. of Rev.*, 374 Md. 463, 503 (2003) (adopting modified version of *Accardi* doctrine for Maryland administrative agencies not covered by the Maryland APA). Maryland state courts should resolve these issues.

The state constitutional claims in Count V under Article 24 of the Maryland Declaration of Rights, and Counts VIII, X, and XII under Article 36 of the Maryland Declaration of Rights, likewise raise novel and complex issues of state law. Generally speaking, "[q]uestions of state constitutional law are best answered by state courts, rather than by the federal judiciary." *Bayadi v. Clarke*, No. 16-cv-3, 2017 WL 1091946, at *6 (W.D.Va. Mar. 22, 2017) (citing *Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 84–85 (1975); *Reetz v. Bozanich*, 397 U.S. 82, 85 (1970)). Indeed, the Supreme Court has announced that "[i]t is fundamental that state courts be left free and unfettered by [federal courts] in interpreting their state

---

[15] Under federal administrative law, the "*Accardi* doctrine . . . provides that when an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid." *Orellana v. Bondi*, 141 F.4th 560, 566 (4th Cir. 2025) (quoting *Nader v. Blair*, 549 F.3d 953, 962 (4th Cir. 2008)); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

constitutions." *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940). Although Maryland courts ordinarily read Articles 24 and 36 *in pari materia* with their federal counterparts, that is not always or necessarily the case. *Koshko v. Haining*, 398 Md. 404, 444 n.22 (2007) (explaining that while Article 24 is ordinarily read *in pari materia* with federal due process provisions, Maryland courts "have not hesitated, where deemed appropriate, to offer a different interpretation"); *Booth v. Maryland*, 337 F.App'x 301, 311 (4th Cir. 2009) ("Maryland state courts have proceeded on the basis that . . . Article 36 and the First Amendment of the United States Constitution have the same effect." (citations omitted)).[16] In fact, the Fourth Circuit has noted that a district court "erred in passing on the merits of plaintiffs' Article 24 claim" because Article 24 is not necessarily *in pari materia* with federal due process provisions. *Waybright*, 528 F.3d at 209. Although the federal Constitution does not grant Plaintiff the protection he asserts, it is possible that Maryland courts will afford greater protection under Articles 24 and 36 the Maryland Declaration of

---

[16] Also novel is the issue of whether Article 36 provides a private cause of action. *Booth*, 337 F.App'x at 311 ("Whether Article 36 of the Maryland Declaration of Rights provides a private cause of action is undecided." (citation omitted)). Other courts in this circuit have declined to exercise supplemental jurisdiction over a state constitutional claim when it is unclear whether the provision of the state constitution at issue contains a private right of action. *E.g.*, *Bayadi*, 2017 WL 1091946, at *6.

Rights.  This court will not interfere with Maryland state courts' resolution of these issues.

Rather than immediately effectuate the remand of the seven state counts, however, the court will delay remand for thirty days to give the parties an opportunity to move to stay the remand pending appeal.  *Forty Six Hundred LLC v. Cadence Educ., LLC*, 15 F.4th 70, 81 (1st Cir. 2021) (explaining that when a district court decides to remand "in a removed case and the remand order is appealable, the district court may wish to avoid immediately certifying the remand order and returning the case file to the state court until it believes" the risk of needing to retrieve the state claims due to reversal on appeal "has abated"); *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 641 (2009) (holding that a remand order is appealable if it is based on the court's decision to decline to exercise supplemental jurisdiction).

## IV.  Conclusion

For the foregoing reasons, Defendants' motions to seal will be granted in part and denied in part, and their motion to dismiss will be granted in part as to the federal claims.  The state law claims will be remanded to state court.  A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge

68